## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **D&B BOAT RENTALS, INC.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 18-623** |
| **UNITED STATES OF AMERICA, NATIONAL POLLUTION FUNDS CENTER, and AMERICAN POLLUTION CONTROL CORP.** | **SECTION D (5)** |

## <u>ORDER</u>

Before the Court are D&B Boat Rentals, Inc.'s and the Federal Defendants' Cross-Motions for Summary Judgment.[1]  The parties have filed Oppositions[2] and Reply Memoranda.[3]  The parties also filed supplemental memoranda addressing the United States Supreme Court's decision in *Kisor v. Wilkie*.[4]  After careful review of the parties' memoranda, the record, and the applicable law, the Court finds that Federal Defendants' interpretation of the relevant regulation does not merit *Auer* deference and fails to pass muster under *Skidmore* deference.  It therefore denies Federal Defendants' Motion, grants the Plaintiff's Motion, and remands this matter for further administrative proceedings consistent with this Order.

---

[1] R. Doc. 22 (D&B Boat Rentals); R. Doc. 24 (Federal Defendants).
[2] R. Doc. 26 (D&B Boat Rentals); R. Doc. 27 (Federal Defendants).
[3] R. Doc. 34 (D&B Boat Rentals); R. Doc. 36 (Federal Defendants).
[4] R. Doc. 41 (D&B Boat Rentals); R. Doc. 46 (Federal Defendants); 139 S. Ct. 2400 (2019).

## I.    FACTUAL BACKGROUND

This case involves an issue of administrative law arising from the sinking of a vessel.  D&B Boat Rentals, Inc., ("D&B"), is a Lafayette, Louisiana based company that owned the M/V RICKY B.[5]  On May 30, 2013, the M/V RICKY B sank.[6]  To assist in removing the sunken vessel and to monitor for pollution, D&B hired various companies, including American Pollution Control Corporation (AMPOL), a Louisiana Corporation.[7]  D&B did not find AMPOL's work satisfactory.  Among other issues, D&B claims that AMPOL failed to adequately perform the work by leaving the site of the wreck and by not adequately marking the sunken vessel.[8]  When AMPOL charged D&B for its services, D&B paid only $164,629.51 of the $240,488.51 bill.[9]

Seeking payment for the $78,859.00 that D&B would not pay on its invoice, AMPOL submitted a claim to the National Pollution Funds Center ("NPFC").[10]  As explained in more detail below, the NPFC is the division of the U.S. Coast Guard which administers the Oil Spill Liability Fund (the "Fund"), and pays claimants, including spill responders, under certain circumstances when they are not paid by the responsible party.  The NPFC is authorized to recoup payments made from the fund for oil spill cleanup from other entities, including the party responsible for the spill.[11]  But such authorizations are premised on certain requirements.  For example,

---

[5] R. Doc. 9 at 1 ¶ 2.
[6] *Id.*at 1 ¶ 1.
[7] *Id.* at 2 ¶ 3.
[8] *Id.* at 2 ¶¶ 4-5.
[9] *Id.* at 2 ¶ 8.
[10] R. Doc. 9 at 3 ¶ 10;  R. Doc. 21 at 6-165.
[11] *See* 33 U.S.C. 2713 § 2713(c)(2); *see also* 33 C.F.R. 136.103(c)(2).

the removal activities must either fall within the National Contingency Plan ("NCP") or be directed by a Federal On Scene Coordinator ("FOSC").[12]

During its investigation into whether AMPOL should be paid, NPFC emailed Commander Keith Smith of Morgan City's Coast Guard office. NPFC claims manager stated: "I am sending you this email with a request for further information about the incident. The claimant states that FOSC coordination was provided by Sector Morgan City and gave me your name as a point of contact."[13] Commander Smith responded with his point of view on the events giving rise to the dispute and specifically stated: "There was no Coast Guard direction to AMPOL."[14]

Over D&B's objection,[15] NPFC paid out AMPOL's claim in full on April 29, 2014.[16] In its "Claim Summary/Determination," NPFC acknowledged that the claimant, AMPOL, must establish:

(a) That the actions taken were necessary to prevent, minimize, or mitigate the effects of the incident;
(b) That the removal costs were incurred as a result of these actions;
(c) That the actions taken were determined by the FOSC to be consistent with the National Contingency Plan or were directed by the FOSC.[17]

In its Findings of Facts, the NPFC stated "these actions were indeed reasonable and allowable under OPA [The Oil Pollution Act] and 33 CFR § 136.205 as set forth below."[18] NPFC then sought reimbursement from D&B. On February 24, 2017,

---

[12] *See* 33 C.F.R. § 136.205.
[13] R. Doc. 21 at 287.
[14] *Id.*
[15] R. Doc. 21 at 239-242.
[16] *Id.* at 167.
[17] *Id.* at 173.
[18] *Id.* at 174.

almost three years after the NPFC paid the AMPOL claim, NPFC sent a letter to D&B seeking reimbursement for the amount paid to AMPOL.[19]  D&B responded by arguing that (1) the statute of limitations had run on any reimbursement claim NPFC may have; (2) that the lack of a Federal On Scene Coordinator, as required by statute, meant the NPFC could not seek reimbursement from D&B; and (3) that NPFC's finding that AMPOL was entitled to payment was arbitrary and capricious.[20]  The NPFC treated D&B's letter as an administrative appeal.[21]  After review, the NPFC affirmed its original findings.[22]  In doing so, the Review Officer specifically stated "[w]hile there was no FOSC [Federal On Scene Coordinator] involved in this incident, the NPFC determined that the removal actions were consistent with the NCP."[23]

This suit followed.  On January 1, 2018, D&B sued the NPFC, the United States, and AMPOL.[24]  Specifically, D&B sought a declaratory judgment that the NPFC was arbitrary and capricious in its determination that D&B is responsible for costs owed to AMPOL.  In support of its claim, D&B asserts, among other things, that NPFC's decision to reimburse AMPOL was arbitrary and capricious since there was no Federal On Scene Coordinator as required by law, and, therefore, the work was not compensable.[25]

---

[19] R. Doc. 9 at 4 ¶ 16.
[20] R. Doc. 21 at 302-04.
[21] *Id*. at 306-308.
[22] *Id*. at 311-316.
[23] *Id*. at 315.
[24] *See* R. Doc. 1.
[25] R. Doc. 1 at 5-6 ¶ 26; R. Doc. 9 at 5-6 ¶ 24.

D&B and the NPFC and the United States (NPFC and the United States, together, "Federal Defendants")  now move for summary judgment.[26]  Each has filed an Opposition to the other's cross-motion,[27] and each has also filed a Reply.[28]  In their Motion, Federal Defendants argue that the decision to reimburse AMPOL was based on substantial evidence, as the record supports a finding that D&B's complaints regarding AMPOL's performance are misplaced.  They also argues that it may seek an administrative offset from D&B notwithstanding the statute of limitations and that D&B received due process.  In its Motion for Summary Judgment and Opposition, D&B argues that because the pollution response was never federalized, NPFC should not have paid AMPOL in the first place.  Specifically, it argues that under the relevant regulation, only in "exceptional circumstances"—which it contends are not present here—may NPFC pay out a claim if there was not a Federal On-Scene Coordinator.  D&B further argues that Federal Defendants should be given little deference in their interpretation of the relevant regulation.  D&B also reiterates its arguments for not paying AMPOL the full amount of its invoice, including that AMPOL failed to mark the sunken vessel and did not properly observe the vessel, thus creating additional work and costs for D&B.  In response, Federal Defendants argue that the lack of an FOSC presence made this an "extraordinary circumstance" warranting intervention under the relevant regulation and that it should be awarded significant deference in interpretation of the relevant regulation.

---

[26] R. Doc. 22 (D&B Boat Rentals); R. Doc. 24 (Federal Defendants).
[27] R. Doc. 26 (D&B Boat Rentals); R. Doc. 27 (Federal Defendants).
[28] R. Doc. 34 (D&B Boat Rentals); R. Doc. 36 (Federal Defendants).

Following the United States Supreme Court's decision in *Kisor v. Wilkie*,[29] the parties submitted supplemental briefing on what level of deference should be afforded to the NPFC's interpretation of the regulation at issue.[30]  D&B submits that nothing more than *Skidmore* deference applies, as *Kisor* cabins the applicability of *Auer* deference to circumstances not present here.  Federal Defendants submit that *Chevron* deference applies to the delegation of authority by the Coast Guard and that *Auer* deference properly applies to the NPFC's interpretation of the relevant regulation, notwithstanding *Kisor*.

## II.   LEGAL STANDARD

This case involves the appeal of an administrative adjudication.  As such, it is governed by the Administrative Procedure Act ("APA").  Under the APA, any "person adversely affected or aggrieved by agency action" is entitled to judicial review "of agency action made reviewable by statute and final agency action for which there is no adequate remedy."[31]  The APA authorizes the Court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law."[32]  This standard is "highly deferential" and courts must "limit our review to whether the agency articulated a rational connection between facts found and the decision made."[33]

---

[29] 139 S. Ct. 2400 (2019).
[30] R. Doc. 41 (D&B Boat Rentals); R. Doc. 46 (Federal Defendants).
[31] 5 U.S.C. §§ 702, 704.
[32] 5 U.S.C. § 706.
[33] *Hayward v. US. Dept. of Labor*, 536 F.3d 376, 379-80 (5th Cir. 2008).

Importantly, though, "[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."[34]

## III.   ANALYSIS

### A.   The Oil Pollution Act and Subsequent Regulations

The primary disagreement between the parties focuses on the appropriate level of deference to offer Federal Defendants' interpretation of the regulation at issue.  To understand that issue, it helps to explore the statutory and regulatory schemes at play in the background of this dispute.  In 1990, Congress passed the Oil Pollution Act ("OPA") as an amendment to the Clean Water Act.  The OPA gave the Coast Guard "primary responsibility for directing oil spill cleanup in the coastal zone."[35] The Coast Guard identifies "responsible parties" who are strictly liable for cleanup in the first instance, and usually are "any person owning, operating, or demise chartering the vessel."[36]

The OPA also established the National Pollution Funds Center which administers the Oil Spill Liability Trust Fund.  "The Fund is authorized both to (1) pay outstanding cleanup costs and damages when a responsible party can limit its liability or establish a complete defense (or where no party is ever identified), *see* [33 U.S.C.] § 2712(a)(4), and (2) to guarantee that particular OPA claimants, including spill responders, are paid quickly, *see id.* § 2713."[37]  On July 27, 1992, the Coast Guard

---

[34] *Motor Vehicle Mfrs. Ass'n of United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983).
[35] *United States v. Am. Commercial Lines, L.L.C.*, 759 F.3d 420, 422 (5th Cir. 2014); *see also* 33 U.S.C. § 1321(d)(2)(C), 40 C.F.R. § 300.145.
[36] 33 U.S.C. § 2701(32).  *See also* 33 U.S.C. § 2702(a), § 2713(a).
[37] *Am. Commercial Lines,* 759 F.3d at 422.

delegated authority to the NPFC to determine whether uncompensated removal costs are consistent with the National Contingency Plan under the OPA.[38]

A claimant must first present its claims to the responsible party, but if that party has not paid the claim within ninety days, then "the claimant may elect to commence an action in court against the responsible party . . . or to the fund."[39] Importantly, the Fifth Circuit has stated: "The Fund will reimburse only those removal costs that are necessary and reasonable, and that adhere to the relevant statutory criteria for Fund payments."[40] It is the *regulatory* criteria for Fund payments that are the primary issue in this dispute. Once a payment has been made by the Fund, the Fund may recoup the payment from other parties, including the responsible party, as the NPFC seeks to do here.[41]

Following the creation of the Oil Spill Liability Trust Fund, the Coast Guard, then a part of the Department of Transportation, developed various regulations for determining how the Fund should be run. Among these is 33 C.F.R. § 136.205, which states the amount of compensation allowable and the particular circumstances which allow for reimbursement. This regulation was noticed on August 12, 1992, and became a final rule thereafter.[42]

---

[38] R. Doc. 24-2.
[39] 33 U.S.C. 2713 § 2713(c)(2); *see also* 33 C.F.R. 136.103(c)(2).
[40] *Am. Commercial Lines,* 759 F.3d at 422 (citing 33 C.F.R. §§ 136.105, 136.201, 136.203, 136.205).
[41] 33 U.S.C. § 2712(f); *see also* 33 C.F.R. § 136.115(a).
[42] Claims Under the Oil Pollution Act of 1990, 57 FR 36314-01 (1992).

**B.     The Regulation and *Kisor v. Wilkie***

This leads us to the instant dispute: what degree of deference should the Court give to the NPFC's interpretation of 33 C.F.R. § 136.205?  D&B argues that the NPFC's interpretation fails as it should be awarded only *Skidmore* deference and cannot survive under that standard.  Federal Defendants contend that the NPFC's interpretation should be given *Auer* deference and that it passes muster under that more deferential standard.

The regulation at issue, 33 C.F.R. § 136.205 provides:

> The amount of compensation allowable is the total of uncompensated reasonable removal costs of actions taken that were determined by the FOSC to be consistent with the National Contingency Plan or were directed by the FOSC.  Except in exceptional circumstances, removal activities for which costs are being claimed must have been coordinated with the FOSC.

The crux of the parties' dispute turns on the last sentence of the regulation, and in particular the term "exceptional circumstances."  In the administrative appeal, the NPFC stated:  "While there was no FOSC involved in this incident, the NPFC determined that the removal actions were consistent with the NCP.  The Claims Regulations provide that in exceptional cases—in those where there is no FOSC presence, the NPFC, pursuant to a delegation of authority, can determine that the actions undertaken by the Claimant are deemed consistent with the NCP."[43]  The NPFC neatly summarized this in its Reply:  "According to the NPFC, the absence of a Federal On-Scene Coordinator is an exceptional circumstance."[44]

---

[43] R. Doc. 21 at 315.
[44] R. Doc. 36 at 5.

The Court initially determines whether this interpretation of the regulation by Federal Defendants is worthy of *Auer* deference.  To make this determination, the Court follows the analysis laid out in *Kisor v. Wilkie*.[45]  The first step in this analysis is to determine whether a regulation is genuinely ambiguous.  Should the Court find that a regulation is ambiguous, the Court must then determine whether the agency's reading is reasonable.  Thereafter, should the Court determine that the agency's reason is reasonable, it must then make an independent inquiry into whether "the character and context of the agency interpretation entitles it to controlling weight."[46] This involves determining whether the regulation is the agency's authoritative or official position, whether the agency's interpretation in some way implicates its substantive expertise, and whether the rule reflects the agency's "fair and considered judgment."[47]

### 1.  *Ambiguity*

The Court first considers whether the regulation is genuinely ambiguous. Before finding a regulation ambiguous, a Court must "exhaust all the 'traditional tools' of construction."[48]  These tools include the "text, structure, history, and purpose of a regulation."[49]  Here, the parties dispute the ambiguity of the phrase "exceptional circumstances" in the regulation.

---

[45] 139 S. Ct. 2400 (2019).
[46] *Id.* at 2416.
[47] *Id.* at 2417 (citing *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012).
[48] *Kisor*, 139 S. Ct. at 2415 (quoting *Chevron U.S.A. Inc. v. Nat. Resources Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984)).
[49] *Id.*

"The starting point to analyze this dispute begins with the actual text of the statute or regulation, where words should be given their ordinary meaning."[50]  The phrase "exceptional circumstances" is not defined in the regulation.  The Court notes that the plain meaning of the word "exceptional" sweeps quite broadly.  Merriam Webster's dictionary defines "exceptional" as "forming an exception, rare" or "deviating from the norm."[51]  While this definition suggests the circumstances must be unusual, the Court notes that there exists wide room for interpretation beyond that.  The structure of the regulation provides little more clarity.  Here, the Court considers the full sentence:  "Except in exceptional circumstances, removal activities for which costs are being claimed must have been coordinated with the FOSC."  The structure of the sentence suggests that the "exceptional" circumstances must be those which would make it impractical or unreasonable to coordinate with the FOSC.  But again, there exists a wide berth for interpretation beyond that, as such circumstances could come in a variety of forms.

The history and purpose of the regulation provide no more clarity.  As to purpose, the second sentence of the regulation appears clearly designed to encourage coordination of removal actions with the Coast Guard's FOSC which is consistent with the Coast Guard's "primary responsibility for directing oil spill cleanup in the coastal zone."[52]   But this purpose doesn't reveal anything about the sort of

---

[50] *Texas v. United States*, 201 F. Supp. 3d 810, 831 (N.D. Tex. 2016); *see also United States v. Hegwood*, 934 F.3d 414, 418 (5th Cir. 2019).
[51] *See* Merriam-Webster, "Exceptional" (2020); available at https://www.merriam-webster.com/dictionary/exceptional.
[52] *United States v. Am. Commercial Lines, L.L.C.*, 759 F.3d 420, 422 (5th Cir. 2014); *see also* 33 U.S.C. § 1321(d)(2)(C), 40 C.F.R. § 300.145.

"exceptional" circumstances that could exist that would merit failing to coordinate with the FOSC.  Similarly, nothing in the history of the regulation offers evidence as to what "exceptional" circumstances were contemplated.  Having found that even after applying the "traditional tools of construction" the phrase "exceptional circumstances" remains unclear, the Court finds that the phrase in the regulation is ambiguous.

> 2.    *Reasonable Interpretation*
>
> > a.    *Textual Considerations*

Having determined that the regulation is ambiguous, the Court next considers whether Federal Defendants' interpretation is reasonable.  To reiterate, the NPFC's interpretation can be found in its determination of administrative appeal:

> While there was no FOSC involved in this incident, the NPFC determined that the removal actions were consistent with the NPC.  The Claims Regulations provide that in exceptional cases – *in those cases where there is no FOSC presence*, the NPFC, pursuant to a delegation of authority, can determine that the actions undertaken by Claimant are deemed consistent with the NPC.[53]

Federal Defendants reiterated this interpretation in their Opposition to D&B's Motion for Summary Judgment, in which they argue "[w]hen removal activities occur without FOSC coordination, the NPFC can, the government submits, choose to deem this an exceptional circumstance and make the NPC consistency—which can go either way—pursuant to delegated authority."[54]  In other words, Federal Defendants

---

[53] R. Doc. 21 at 315 (emphasis added).
[54] R. Doc. 27 at 7.

are interpreting the phrase "exceptional circumstances" as those in which no FOSC is present or where there is no FOSC coordination.

This is not a reasonable interpretation. Federal Defendants' reading of the regulation essentially renders the final sentence of the regulation meaningless. That sentence reads: "Except in exceptional circumstances, removal activities for which costs are being claimed must have been coordinated with the FOSC." Federal Defendants' suggested reading of the sentence is: "Removal activities for which costs are being claimed must be coordinated with the FOSC, but if they are not coordinated with the FOSC, circumstances are inherently exceptional and therefore costs may still be claimed." Such a reading strains reason and runs headlong into the rule against surplusage. That rule "encourages courts to give meaning to every word or phrase, and avoid any construction that would make a provision superfluous."[55]

As described above, the phrase "exceptional circumstances" may be read broadly. But it cannot be read so broadly as to encompass *all* circumstances in which a removal activity is not coordinated with the FOSC, or there would be no need for the regulation to go on to state that "removal activities for which costs are being claimed must have been coordinated with the FOSC." Such a reading would read out the phrase "Except in exceptional circumstances." Moreover, one can imagine numerous circumstances that would prevent coordination with the FOSC but do not

---

[55] *Fowler v. General Ins. Co. of America*, No. 13-2596, 2014 WL 5879490, at *3 (N.D. Tex. Nov. 13, 2014) (citing *Tesfamichael v. Gonzales*, 411 F.3d 169, 175 (5th Cir. 2005) (applying the rule)). *See also* Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012) ("If possible, every word and every provision [of an enactment] is to be given effect . . . None should be ignored.").

rise to the level of "exceptional," *i.e.*, "rare."   Indeed, the instant matter seems a relatively straightforward and (unfortunately) common removal action, and indeed Federal Defendants have identified no "exceptional" circumstances beyond the fact that there happened to be no FOSC coordination.   There is no indication that the FOSC's attention was required for a separate emergency or that it was impractical to coordinate with the FOSC, circumstances which, depending on the particulars, could certainly rise to the level of "exceptional."   Federal Defendants are silent as to any reason for a failure to have FOSC coordination.

It is important to note that Federal Defendants *do not* argue that removal activities were "coordinated" with the FOSC, and therefore no exceptional circumstances are required for payment.[56]  As discussed above, the second sentence of the regulation states that compensation is allowed when the removal actions "were determined by the FOSC to be consistent with the National Contingency Plan or were *directed* by the FOSC."   The regulation continues to note that, barring exceptional circumstances, removal activities "must have been *coordinated* with the FOSC."   The use of the term "coordinated" in the second sentence, rather than the term "directed" that is used in the first sentence, contemplates that something less than direction of the removal action by the FOSC is required to forgo the presence of "exceptional circumstances."   Because Federal Defendants do not argue that AMPOL's removal efforts were "coordinated" with the FOSC, the Court does not consider whether such

---

[56] The Court notes that the FOSC was given notice of the sinking of the Ricky B, and of AMPOL's removal actions.  *See* R. Doc. 21 at 170. The FOSC was clearly continuously aware of the efforts made to salvage the Ricky B.  *See* R. Doc. 21 at 287.  Whether this rises to the level of "coordination" with the FOSC is not before the Court.

a coordination occurred.  The Court cannot affirm an agency's action based on an interpretation not offered by the agency.[57]  Instead, as noted herein, Federal Defendants argue that the lack of coordination alone merits exceptional circumstances.

In short, although the Court has found ambiguity in the regulation, Federal Defendants' proffered interpretation falls nowhere within that ambiguity and conflicts with the plain language of the regulation.  And because Federal Defendant's tortured reading of the regulation would render the final sentence of the regulation meaningless, the Court finds it unreasonable under *Kisor*.

       b.    *Counterarguments*

Defendant resists this conclusion with a legal argument, a policy argument, and a practical argument.  The Court addresses each in turn.

       i.    Chevron *Deference*

The Court addresses Federal Defendants' primary argument first:  Federal Defendants were provided a broad delegation of authority, subject to *Chevron* deference, to determine whether and when removal costs are consistent with the NCP.[58]  Federal Defendants point to 33 U.S.C. § 2712, which states that "The Fund shall be available to the President for . . . payment of removal costs, including the costs of monitoring removal actions, determined by the President to be consistent

---

[57] *Motor Vehicle Mfrs. Ass'n of United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."); *see also Clean Water Action v. United States Environmental Protection Agency*, 936 F.3d 308, 312 (5th Cir. 2019) (same); *Knapp v. United States Dept. of Ag.*, 796 F.3d 445, 453 (5th Cir. 2015) (same).

[58] *See* R. Doc. 24-1.

with the National Contingency Plan. . . . by Federal authorities."[59]  The President delegated this authority to the Department of Transportation, which in turn delegated it to Coast Guard, which in turn delegated it to the Chief Office of Marine Safety, which finally delegated it to the Director of the NPFC.[60]  Federal Defendants contend they therefore have broad authority, consistent with *Chevron* deference, to determine what removal costs should be paid by the Fund.  Relatedly, Federal Defendants argue that 33 C.F.R. § 136.205 would be subject to *Chevron* deference if facially challenged.  Federal Defendants are right on two counts:  they do have broad authority to determine what actions are consistent with the NCP, and 33 C.F.R. § 136.205 would be subject to *Chevron* deference if facially challenged.  Neither argument changes the outcome here.

No one quarrels with Federal Defendants' claim that they have broad discretion under the delegation of authority to determine when actions are consistent with the NCP.  But the statute also grants the executive the authority to promulgate and amend "regulations for the presentation, filing, processing, settlement, and adjudication of claims under this Act against the Fund."[61]  Here, the executive (through the Coast Guard) exercised that authority and promulgated 33 C.F.R. § 136.205, a regulation which requires a party submitting a claim to have coordinated with the FOSC unless exceptional circumstances were present.  Federal Defendants may not use a broad grant of authority in a separate part of the statute to *ignore* the

---

[59] 33 U.S.C. § 2712(a)(1)(A).
[60] *See* R. Doc. 24-1.
[61] 33 U.S.C. § 2713(e).

plain language of the Coast Guard's own promulgated regulation.[62]   Indeed, the regulation at issue acknowledges the broad authority of Federal Defendants to determine when removal actions are consistent with the NCP.   It specifically states that the allowable amount of compensation is the total reasonable removal costs of actions taken "*that were determined by the FOSC to be consistent with the National Contingency Plan* or were directed by the FOSC."[63]   The regulation then separately adds the additional requirement that removal actions must have been coordinated with the FOSC unless exceptional circumstances are present.   Federal Defendants cannot avoid the second sentence by arguing that it has broad power to determine which actions were consistent with the National Contingency Plan, a separate requirement listed in the first sentence of the regulation.

Nor does the fact that a facial challenge to 33 C.F.R. § 136.205 would be subject to *Chevron* deference have relevance here.   Federal Defendants' argument seems to be that because it has broad authority to draft regulations related to the OPA, the Court should grant significant deference to Federal Defendants' reading of those regulations.   Plaintiff does not argue that Defendants' drafting and implementation of the regulation runs afoul of the statute or Federal Defendants' authority; instead, Plaintiff argues that the Federal Defendants adjudication of Plaintiff's claim runs afoul of the regulation.   Once an agency has drafted and proposed a given regulation, it may not suddenly alter course from the plain language of the regulation because it

---

[62] *Texas v. United States*, 201 F. Supp. 3d 810, 833-34 (N.D. Tex. 2016) (noting that an agency is bound by the plain texts of its regulations even when it offers a different interpretation of their meaning that runs counter to the text).
[63] 33 C.F.R. § 136.205 (emphasis added).

could have chosen to draft the regulation differently.  Indeed, Federal Defendants'
argument seems to ignore "step two" of *Chevron* deference, which holds that "[i]f
Congress has explicitly left a gap for the agency to fill," as they did here, "there is an
express delegation of authority to the agency to elucidate a specific provision of the
statute by regulation.  *Such legislative regulations are given controlling weight* unless
they are . . . manifestly contrary to the statute."[64]  The regulation at issue here, and
its plain text, has controlling weight and cannot be ignored by Federal Defendants.

ii.     *Policy Arguments*

The Court next turns to Federal Defendants' policy argument.  Federal
Defendants contend that the OPA sought to reduce "the substantial financial risks
and liability exposures associated with spill response [,which] could deter vessel
operators, cleanup contractors, and cleanup cooperative from prompt, aggressive
response" to spills.[65]  Indeed, Congress had a goal of "relieve[ing] a private claimant
from protracted negotiations and litigation with a responsible party."[66]  Federal
Defendants urge that only through its reading of the regulation, where "exceptional
circumstances" are never really required to avoid coordination with the FOSC, can
these policies be given effect.

However compelling a policy argument Federal Defendants can make, their
interpretation cannot contradict the plain language of the regulation.[67]  To the extent

---

[64] *Chevron*, 467 U.S. at 843-44 (1984).
[65] H.R. Rep. No. 101-653 at 146 (1990).
[66] H.R. Rep. No. 101-242, Part 2, at 68 (1989).
[67] *Johnson v. McDonald*, 762 F.3d 1362, 1366 (Fed. Cir. 2014) (holding that policy arguments are not
a proper reason to depart from the plain language of a regulation); *see also Sierra Club v. United States
Environmental Protection Agency*, 964 F.3d 882, 899 n.18 (10th Cir. 2020) ("[A] policy argument cannot
override unambiguous regulatory language.").

that policy arguments are considered here, the Court notes that they cut both ways. Federal Defendants' reading of the regulation could discourage *any* coordination with the FOSC. Indeed, under Federal Defendants' reading, funds would be available even were the FOSC not notified of the removal action and discharge until well after it had taken place. The OPA clearly envisions at least some role for the Coast Guard in removal actions.[68] Indeed, the Coast Guard has "primary responsibility for directing oil spill cleanup in the coastal zone."[69] Federal Defendants' reading, which suggests that no coordination with the FOSC is necessary to recover costs for removal actions, flies in the face of this policy consideration.

### iii.   *Practical Arguments*

Finally, the Court turns to Federal Defendants' practical argument. Federal Defendants argue that they regularly make payments for removal actions from the Fund where the removal actions are not coordinated with the FOSC.[70] The Court certainly takes this argument into serious consideration. Indeed, the Court considers "the government's early, longstanding, and consistent interpretation of a statute,

---

[68] *See, e.g.*, 33 U.S.C. § 2714 (describing the tasks the executive must take upon notification of an incident, including designating the source or sources of discharge and notifying the responsible party).
[69] *United States v. Am. Commercial Lines, L.L.C.*, 759 F.3d 420, 422 (5th Cir. 2014); *see also* 33 U.S.C. § 1321(d)(2)(C), 40 C.F.R. § 300.145.
[70] The Court notes that the primary evidence that Federal Defendants rely upon for this argument is an exhibit attached to the Supplemental Memorandum. *See* R. Doc. 46-1. Generally, an agency may not supplement the record on an administrative appeal, except in certain circumstances, none of which the Court finds to be present here. *See Medina Cty. Environ. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 706 (5th Cir. 2010) (Supplementation of the administrative record is not allowed unless the moving party demonstrates 'unusual circumstances justifying a departure' from the general presumption that review is limited to the record complied by the agency.'" (citing *Am Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008)). The Court nonetheless addresses Federal Defendants' argument that it regularly pays claims based on the Delegation of Authority that were not coordinated with the FOSC based on Federal Defendants's arguments and representations in its memoranda that this is a common practice by NPFC.

regulation, or other legal instrument could count as powerful *evidence* of its original public meaning."[71]   But here, the Court has found that Federal Defendants' interpretation does not fit within the ambiguity of the regulation.  And courts reject even longstanding practices where an agency's interpretation of a statute or regulation conflicts with its plain text.[72]   This is because "longstanding yet impermissible agency practice cannot ripen into permissible agency practice."[73]

    3.    *Skidmore and Conclusion*

    Because the Court has found that Federal Defendants' interpretation is not reasonable, the Court need not reach the further considerations required by *Kisor*, including whether Federal Defendants' interpretation is the official position of the agency or is one informed by substantive expertise.  The Court's finding that Federal Defendants' interpretation of the statute is unreasonable renders *Auer* or *Kisor* deference inapplicable to Federal Defendants' interpretation of 33 C.F.R. § 136.205. As such, it is only entitled to *Skidmore* deference, or the "deference its persuasiveness warrants."[74]   "*Skidmore* deference is a weaker form of deference that accords 'weight' to an agency's judgment depending on 'the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later

---

[71] *Kisor v. Wilkie*, 139 S. Ct. 2400, 2426 (2019) (Gorsuch, J., concurring) (emphasis in original).

[72] *Rapanos v. United States*, 547 U.S. 715 (2006) (rejecting a long-standing interpretation based on the statutory text and interpretive canons); *EEOC v. Arabian American Oil Co.*, 499 U.S. 244 (1991) (disregarding an eleven-year old agency interpretation because its "persuasive value is limited"); *Mayberg v. Sec'y of Health & Human Servs.*, 740 F.2d 100, 105-06 (1st Cir. 1984) (rejecting a long-standing interpretation based on a dictionary definition and policy concerns).

[73] *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 246 n.13 (2009) (Stevens, J., dissenting).

[74] *Environmental Integrity Project v. United States Environmental Protection Agency*, 969 F.3d 529, 540 (5th Cir. 2020) (citing *Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 580 (D.C. Cir. 2016)).

pronouncements, and all those factors which give it power to persuade, if lacking power to control.'"[75]

Given that the Court has already found Federal Defendants' interpretation of the regulation unreasonable such that it is not awarded *Auer* deference, it will come as little surprise that the Court finds the interpretation unreasonable under *Skidmore*, for the exact same reasons detailed above.

The Court's determination that Federal Defendants' interpretation of 33 C.F.R. § 136.205 is unreasonable ends the instant inquiry.  Federal Defendants' payment from the Fund to AMPOL ran afoul of 33 C.F.R. § 136.205 because they have conceded that there was no coordination with the FOSC in this case and because they have articulated no "extraordinary circumstances" under the statute, or any extraordinary circumstances at all,  that warrant the failure to coordinate with the FOSC.  As such, the Court need not reach the remaining questions the parties pose, including whether NPFC's offset is timely, whether D&B received due process, and whether Federal Defendants' factual determinations were arbitrary and capricious.

Because the Court has determined that Defendants' action was contrary to the law, the Court sets aside the agency action against D&B.  Specifically, it vacates the NPFC's final decision in this matter and remands this matter to the agency.  Vacatur and remand are the "usual" remedies and are appropriate here.[76]   The Court acknowledges that D&B seeks declaratory judgment.  But vacatur and remand are

---

[75] *Id.* (citing *Dhuka v. Holder*, 716 F.3d 149, 154 (5th Cir. 2013)).
[76] *See, e.g.*, *New York v. United States Dept. of Comm.*, 351 F. Supp. 3d 502, 671-78 (S.D.N.Y. 2019); *District of Columbia v. United States Dep't of Agriculture*, 444 F. Supp. 3d 1, 47-48 (D.D.C. 2020).

remedies sufficient enough to vindicate D&B's rights, as NPFC may not pursue an offset action against D&B based on a vacated decision that was contrary to law.[77] Declaratory judgment would not have a "meaningful practical effect independent of . . . vacatur."[78]   The Court therefore exercises its discretion to decline to grant declaratory judgment.

## IV.   CONCLUSION

**IT IS HEREBY ORDERED** that D&B's Motion for Summary Judgment is **GRANTED**, and Federal Defendants' Motion for Summary Judgment is **DENIED**.

New Orleans, Louisiana, December 21, 2020.

**WENDY B. VITTER
UNITED STATES DISTRICT JUDGE**

---

[77] *See, e.g., New York v. United States Dept. of Comm.*, 351 F. Supp. 3d at 678-79; *Endo Pharmaceuticals, Inc. v. Federal Trade Commission*, 345 F. Supp. 3d 554, 561-66 (D. Penn. 2018).
[78] *Franciscan Alliance v. Azar*, 414 F. Supp. 3d 928, 946 (N.D. Tex. 2019) (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)).